■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ROBERT LIND, Appellant. THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v SAMUEL CABASSA, Appellant.—Judgments of the Supreme Court, New York County (Francis Pecora, J.), rendered January 16, 1984 and January 23, 1984, convicting defendants Cabassa and Lind, respectively, after trial by jury, of attempted murder in the first degree, three counts of attempted murder in the second degree and two counts of criminal use of a firearm in the first degree, and sentencing defendant Cabassa to three concurrent terms of 8⅓ to 25 years for the attempted second degree murder counts and two concurrent terms of 5 to 10 years for the criminal use of a firearm counts and a consecutive term of 25 years to life for the attempted murder in the first degree count, all of the sentences to be consecutive to parole time defendant owed on a prior conviction, and sentencing defendant Lind as a persistent felony offender to three concurrent terms of 25 years to life for the attempted second degree murder convictions and two concurrent terms of 10 years to life on the criminal use of a firearm convictions and a consecutive term of 25 years to life on the attempted first degree murder conviction, are affirmed.

Plainclothes Officers Modica, De Vito and Cialone were

patrolling in Washington Heights in Manhattan in a taxicab when they observed a white Cadillac parked at 167th Street and Amsterdam Avenue with defendant Cabassa at the wheel, defendant Lind sitting in the front passenger seat and one Michael Acobes seated behind Lind. The Cadillac proceeded south on Amsterdam Avenue and the officers made a U-turn and followed it to 158th Street and Edward Morgan Place. Since the auto had inoperable tail lights and its trunk lid was bouncing up and down, the officers, after identifying themselves as police, "instructed the occupants of the car to pull over" but although the order was acknowledged, the Cadillac sped through the intersection and toward the southbound entrance of the Henry Hudson Parkway. As it got onto the parkway, it collided with another vehicle but continued south with the police in the taxi in pursuit. The Cadillac continued at speeds of 60 miles per hour, defendant Lind leaning out the window firing on two occasions at the pursuing police who returned the fire both times.

Police Officers Raymond Ruiz and Ronald Connelly, in uniform, had set up their patrol car as a roadblock near 125th Street. Connelly was in front and Ruiz in the rear of the car as the Cadillac approached and Lind opened fire on the waiting police officers. As the Cadillac swerved around the roadblock, an automatic weapon was thrown out from Lind's window. After leaving the highway at high speed, the chase ended when the Cadillac went out of control and crashed into a parked auto. Hearing a gunshot at the moment of impact, Officers DeVito and Cialone each fired one shot into the Cadillac and defendants were apprehended. On the front floor of the Cadillac a loaded 9mm ammunition clip was removed and a 32 caliber automatic and a 9mm automatic were recovered near 125th Street on the West Side Highway. While the 32 caliber was completely operable, the 9mm automatic was test fired by the ballistic experts only by the use of a screwdriver depressing a mechanism.

Both defendants contend on appeal that the People failed to prove beyond a reasonable doubt that they intended to kill any of the police. However, the conclusion reached by the jury that both men possessed the intent to kill the officers when Lind shot at them with Cabassa driving the car, was amply supported by the evidence and was, indeed, the only reasonable view of the People's evidence. Lind repeatedly fired at the plainclothes officers with an automatic weapon. A bullet mark was left on the police taxi windshield as silent confirmatory evidence that he was aiming at the officers themselves and

shooting to kill. This intent was dramatically evinced when defendants approached the roadblock with the two waiting uniformed officers. Lind stretched all the way out of the window bracing his arm against the windshield and firing directly at the officers beginning fifteen yards away.

Although Cabassa did not himself fire any shots, the evidence that he shared in Lind's intent to kill was compelling. After the Cadillac was first pulled over, Lind and Cabassa conversed for a few moments and then the car driven by Cabassa sped away. Cabassa continued to drive at "breakneck" speeds even after Lind first fired at the plainclothes officers, then engaged in automotive legerdemain in racing toward the manned roadblocks as Lind fired weaving through the small space left by the police car. Under these circumstances, the jury had ample basis for its rejection of defendant Cabassa's testimony that no one in the Cadillac fired any shots at the police or even possessed a weapon, and finding that both defendants acted with the intent to kill the police officers.

Defendants also raise a subsidiary issue, i.e., Lind asserts that the trial court erred in not submitting attempted assault in the first degree as a lesser included offense of attempted murder and both defendants contend the jury should have been charged on attempted assault in the second degree as a lesser included offense. "To establish entitlement to a lesser included offense charge, the defendant must make two showings. First, it must be shown that the additional offense that he desires to have charged is a 'lesser included offense', i.e., that it is an offense of lesser grade or degree and that in all circumstances, not only in those presented in the particular case, it is impossible to commit the greater crime without concomitantly, by the same conduct, committing the lesser offense. That established, the defendant must then show that there is a reasonable view of the evidence in the particular case that would support a finding that he committed the lesser offense but not the greater." *(People v Glover,* 57 NY2d 61, 63.) Application of the first prong of this test validates the trial court's refusal to charge attempted assault in the first degree as a lesser included offense. Such an offense is committed when a person, with intent to cause serious physical injury to another, attempts to cause such injury by means of a deadly weapon or dangerous instrument (Penal Law §§ 110.00, 120.10 [1]). Attempted murder in the second degree, on the other hand, is committed when a person with the intent to cause the death of another, attempts to cause such death (Penal Law

§§ 110.00, 125.25). Thus, it is theoretically possible to commit attempted murder without, at the same time, committing attempted assault in the first degree, since attempted murder does not have a requirement that defendant use a deadly weapon or dangerous instrument in the attempt.

On the other hand, attempted assault in the second degree, i.e., attempting to cause serious physical injury to another with the intent of causing such serious physical injury, *is* a lesser included offense of attempted murder in the second degree. However, the trial court correctly also did not charge this lesser included offense since here the second prong of the test was not met, i.e., there was no "reasonable" view of the evidence in this particular case that would support a finding that either defendant committed the lesser offense but not the greater. While the dissent finds the trial court's failure to submit the lesser charge is erroneous, its conclusion that "the jury could have reasonably concluded that if Lind intended to hit any of the officers at all, his objective was to injure, rather than kill them" is simply not borne out by the evidence which the jury had before it. It is true that the jury could find that Lind and Cabassa only wanted to get away from the police and the shots were simply a "scare" tactic by defendants. If this was the jury's conclusion, however, it had the opportunity to acquit defendants. The dissent, however, postulates a situation where the defendants did not possess the intent to kill the officers, *nor* the intent to scare them off. Rather, the hypothetical situation set forth is that defendants possessed an intent to seriously injure the police. However, as to this third possible scenario, there was no identifiable basis in the evidence presented by the People, or in Cabassa's denial that any shots were fired, for any "reasonable" conclusion that defendants intended to seriously injure the police officers as opposed to killing or warning them off. "Intent is a subjective state of mind and is demonstrated by objective evidence. Here the defendant's intent was demonstrated by his firing his gun at police officers at short range during a chase on a sidewalk where other persons were walking. The trial court, in evaluating the defendant's conduct, could well determine that the defendant's intent was to perpetrate death rather than simply serious physical injury. There should be 'objective indications of a defendant's state of mind to corroborate, in a sense, the defendant's own subjective articulation' *(People v Strong,* 37 NY2d 568, 571-572; see *People v Shuman,* 37 NY2d 302; *People v Discala,* 45 NY2d 38, 42-43; *People v Goodwin,* 64 AD2d 780).* Nothing appears in this record to indicate that the

defendant's intent was to commit serious physical injury rather than death." *(People v Burke,* 73 AD2d 627, 627-628.)

The dissent further cites as error the trial court's grant of defendant Cabassa's application to proceed *pro se* during summation, citing *People v Kaltenbach* (60 NY2d 797) for the proposition that "it was incumbent upon the court to inform defendant of the risks involved in self-representation prior to granting his request to proceed *pro se".* However, while *Kaltenbach (supra)* instructs that a court has a duty to inquire, when a defendant wishes to represent himself, as to whether defendant appreciates the dangers and disadvantages of giving up the fundamental right to counsel *(supra,* at 798-799), defendant did not waive his right to counsel. "Inasmuch as defendant did not waive his constitutional right to representation and did not proceed in his defense without the assistance of counsel, an inquiry for the purpose of ensuring that defendant's waiver was competent, intelligent, and voluntary * * * was not called for". *(People v Rodriguez,* 98 AD2d 961, 962-963, *cert denied* 469 US 818.)

Defendant's participation was limited solely to the summation and his counsel was present throughout and even interposed an objection to a comment made by the court during the summation. Consequently, Criminal Term was not obliged to conduct the " 'searching inquiry' " *(People v Sawyer,* 57 NY2d 12, 21, *cert denied* 459 US 1178) necessary before granting a defendant's request to represent himself at trial. The circumstances attending the court's grant of defendant's application to simply make his own summation with counsel present and participating sufficiently complied with the rules regarding waiver *(People v Landy,* 59 NY2d 369, 377).

Defendant Cabassa also contends that the People failed to prove that he possessed either gun or that the 9mm gun was operable. However, as detailed *supra* the evidence amply supported the jury's finding that defendant Lind constructively possessed the weapons found at the roadblock and that Cabassa was his willing accomplice in that possession. Further, pursuant to Penal Law § 265.09 (1), a person is guilty of criminal use of a firearm in the first degree when he commits a specified violent felony offense and he "possesses a deadly weapon, if the weapon is a loaded weapon from which a shot, readily capable of producing death or other serious injury may be discharged". Here, the evidence presented was that when the 9mm automatic was recovered, it was loaded but the People's ballistics expert testified it did not appear to have been fired that night. Further, the gun was test fired manu-

ally by the police only by using a screwdriver while inserting a cartridge. We note, however, that pursuant to the statute, there is no requirement that the gun actually had been used but rather that it be "loaded" and "deadly", "from which a shot, readily capable of producing death or other serious injury *may* be discharged" (Penal Law § 265.09 [1]; emphasis added). Consequently, the evidence was sufficient to support the jury's verdict that the weapon was operable at the time of its recovery *(see, People v Cavines,* 70 NY2d 882 [police officer at scene dismantled gun removing jammed bullet and gun test fired thereafter]; *People v Francis,* 126 AD2d 740 [weapon's revolving mechanism not functioning properly but weapon could be aligned manually and discharged and was test fired]).

We have examined the remaining contentions by defendants and find them to be without merit. Concur—Ross, J. P., Milonas and Asch, JJ.

Carro and Rosenberger, JJ., dissent in a memorandum by Rosenberger, J., as follows: The cumulative effect of the errors committed by the prosecutor and the court deprived defendants of a fair trial. Accordingly, I would reverse and remit the matter for a new trial.

During the evening of December 16, 1982, plainclothes Police Officers Modica, Cialone and De Vito of the Street Crime Taxi and Gun Squad were on patrol in a taxicab on Amsterdam Avenue in the vicinity of 165th Street, when they noticed a white Cadillac whose tail lights were not working properly and whose trunk lid was bouncing up and down. Modica drove alongside the car at a red light, identified himself as a police officer and instructed the passenger in the front seat, defendant Lind, to have the driver of the vehicle pull the car over to the side of the road. Lind nodded but when Modica backed his cab behind the Cadillac, the Cadillac, driven by defendant Cabassa, accelerated through the red light. The officers took off in pursuit.

After broadsiding another car, the Cadillac continued speeding down the highway. Lind then leaned out the front passenger window and fired a shot in the direction of the cab which was some four or five car lengths away. Modica returned fire at the Cadillac. Moments later, Lind again began shooting in the direction of the cab which was forty to fifty feet away. The officers shot back as the chase continued at speeds up to seventy miles per hour.

Officers Ruiz and Connelly heard De Vito's request for assistance over the radio and set up a roadblock near 125th

Street. Connelly stood in front of his patrol car while Ruiz positioned himself at the rear. As the Cadillac neared the roadblock, Lind leaned out the window and shot in the direction of the uniformed officers who fired back. Someone in the Cadillac threw a gun out of the window as the car squeezed through the roadblock and continued down the highway. The cab with the plainclothes officers was still in pursuit.

The Cadillac left the highway at 56th Street and proceeded south on Twelfth Avenue for a few blocks before crossing under the elevated roadway. The chase finally ended on 48th Street when the Cadillac spun out of control and crashed into a parked car. After hearing a gunshot, the officers pulled their cab up to defendants' car and fired twice. They then jumped out of the cab with guns drawn and yelled "[p]olice. Don't move." Lind and Cabassa, who was injured, were removed from the vehicle along with a third passenger, Michael Acobes, who had been seated in the back of the car.

The officers recovered a 9mm Browning automatic weapon from the right front floor of the Cadillac along with a clip loaded with seven rounds of live ammunition. In the trunk the officers discovered three Halloween masks and two expired license plates. A 9mm automatic weapon and a 32 caliber automatic weapon were later found near the 125th Street entrance ramp of the West Side Highway by a tow truck driver. The grip was missing from the 32 caliber weapon and its handle had been smashed. A ballistics expert testified that the 32 caliber weapon and the ammunition found inside it were fully operable. The 9mm weapon, however, bore no evidence of discharge and its hammer would not release. The clip for the weapon could not be inserted because the gun was damaged. When the ballistics team used a screwdriver to press down the gun's magazine disconnect, however, they were able to insert a cartridge and fire the weapon.

Defendant Cabassa testified that the chase with the officers began when he tried to escape from the cab which had tried to force him off the road. He added that he did not know that the occupants of the cab were police officers until his car crashed on 48th Street. Cabassa insisted that neither he, Lind nor Acobes used or possessed a weapon that night and that the only shots fired were fired by the police.

Lind and Cabassa were convicted of three counts of attempted murder in the second degree with respect to the shots Lind purportedly fired at the plainclothes officers and of attempted murder in the first degree for firing in the direction

of uniformed Officer Ruiz. They were also convicted of two counts of criminal use of a firearm in the first degree. Michael Acobes was acquitted of all charges.

While I agree with the majority that the evidence was legally sufficient to establish defendants' guilt of criminal use of a firearm in the first degree with respect to the 9mm weapon, in my view, the refusal of the trial court to submit to the jury attempted assault in the second degree as a lesser included offense of the attempted murder counts, despite repeated requests by defense counsel, in addition to other errors, requires the reversal of defendants' convictions and a new trial.

A trial court must submit a lesser included offense when a defendant demonstrates that the charge requested is in fact a "lesser included offense" and that there is a reasonable view of the evidence to support a finding that he committed the lesser offense but not the greater (CPL 300.50 [1], [2]; *People v Glover*, 57 NY2d 61). A person is guilty of attempted murder in the first degree when, with intent to cause the death of another person, he attempts to cause the death of a police officer, performing his official duties, and knows, or reasonably should know, that the victim was a police officer (Penal Law §§ 110.00, 125.27). A person is guilty of attempted murder in the second degree when with intent to cause the death of another person, he attempts to cause the death of such person (Penal Law §§ 110.00, 125.25). In order to be convicted of attempted assault in the second degree, the People must prove that a defendant, with intent to cause serious physical injury to another person, attempts to cause such injury to such person or to a third person (Penal Law §§ 110.00, 120.05).

The People concede that attempted assault in the second degree is a lesser included offense of both attempted murder in the first and second degrees. However, they maintain that there is no reasonable view of the evidence to support the conclusion that defendants only intended to cause serious physical injury to the officers.

The court must consider the evidence in the light most favorable to defendants in determining whether there is a reasonable view of the evidence to support the submission of a lesser included offense *(People v Steele,* 26 NY2d 526), keeping in mind that the jury is free to accept or reject part or all of the defense or prosecution evidence *(People v Henderson,* 41 NY2d 233). " 'The test of whether a "lesser included offense" is to be submitted is certainly not that it is probable that the

crime was actually committed or even that there is substantial evidence to support such a view. It suffices that it is supportable on a rational basis or, put another way, by logical necessity. To warrant a refusal to submit it "every possible hypothesis" but guilt of the higher crime must be excluded *(People v Shuman,* 37 NY2d 302, 304, *supra; People v Malave,* 21 NY2d 26)' " *(People v Alamo,* 128 AD2d 441, 442, quoting *People v Henderson, supra,* at 236).

Regardless of the persuasiveness of the evidence indicating guilt of the higher counts, the question simply is whether, on any reasonable view of the evidence, it is possible for the trier of facts to acquit defendants on the higher counts and still find them guilty on the lesser one *(People v Henderson, supra).* The record reveals that Lind fired the first two shots at the cab from a distance of four or five car lengths, by extending his arm out the window of the Cadillac which was careening between lanes at high speed. Lind fired at Officer Ruiz from a substantial distance away as well while the Cadillac sped by. None of the officers were injured.

The essential difference between attempted assault in the second degree and the attempted murder counts is the requisite intent *(People v Rodriguez,* 63 AD2d 919). The question of intent is one for the jury to resolve *(see, People v Butler,* 57 NY2d 664, *revg on dissenting opn of Sandler, J.,* 86 AD2d 811, 812-815). Under the circumstances, the jury could have reasonably concluded that if Lind intended to hit any of the officers at all, his objective was to injure, rather than kill them *(People v Alamo, supra; People v Logan,* 120 AD2d 359, *lv denied* 68 NY2d 758; *cf., People v Burke,* 73 AD2d 627). With regard to Cabassa, who was charged with having acted in concert with Lind, a reasonable juror could have concluded that neither he, nor Lind, possessed the requisite intent to kill or that even if Lind was guilty of that charge, he did not share Lind's murderous intent. *(See, People v McLean,* 107 AD2d 167, *affd* 65 NY2d 758; *People v Nieves,* 135 AD2d 579, *lv denied* 71 NY2d 1031; *People v Chmarzewski,* 51 AD2d 554.) Cabassa was the driver of the vehicle and there is no evidence connecting him to the firing of a weapon.

Additional errors, while possibly harmless when considered in isolation, had the cumulative effect of depriving defendants of a fair trial. It was error to admit the three Halloween masks found in the trunk of the Cadillac, since this irrelevant evidence invited the jury to speculate that defendants had worn them previously in some illicit undertaking, unrelated to the crimes charged in the indictment *(see, People v McDer-*

*mott,* 150 AD2d 805). The jury was also permitted to infer that since there were three masks, the three perpetrators were acting in concert when Lind fired at the police.

The prosecutor's questioning of defendant Cabassa exceeded the proper bounds of cross-examination. At the *Sandoval* hearing, the prosecutor was precluded from inquiring into any of defendant's arrests which had not resulted in a conviction. The court, however, did permit the prosecutor to inquire into defendant's use of aliases. Based on these rulings, the prosecutor proceeded to question Cabassa about his use of aliases specifically in connection with arrests for which he was not convicted. Such inquiry clearly subverted the court's *Sandoval* ruling *(People v Cook,* 37 NY2d 591; *People v Esquilin,* 141 AD2d 838, *lv denied* 73 NY2d 854; *People v Malphurs,* 111 AD2d 266, *lv denied* 66 NY2d 616, 920; *People v Dowdell,* 88 AD2d 239). It was also error to permit the prosecutor to impeach defendant with traffic violations *(People v Sandoval,* 34 NY2d 371, 377; *People v Yost,* 50 AD2d 577).

The trial court also prematurely granted Cabassa's application to proceed *pro se* during summation. Permission was granted without first informing him of the risks involved in self-representation and without first obtaining his knowing and intelligent waiver of the assistance of counsel *(People v Landy,* 59 NY2d 369, 377). Although defense counsel informed the court that he had instructed his client as to what constituted permissible comment and although counsel objected to a comment made by the court during defendant's closing remarks, it was incumbent upon the court to inform defendant of the risks involved in self-representation prior to granting his request to proceed *pro se (see, People v Kaltenbach,* 60 NY2d 797).

Although defense counsel did not object to the court's interested witness charge, it should also be noted that the instruction provided was erroneous. After correctly informing the jury that defendant Cabassa was an interested witness, the court then instructed them that "such testimony is not to be disbelieved necessarily but that it [should] be weighed more closely and scrutinized more carefully * * * than the testimony of disinterested witnesses." This court has previously condemned the use of similar language in an interested witness charge as singling out defendant's testimony for special scrutiny, or leaving such testimony open to more question than that of any other witness *(People v Gadsden,* 80 AD2d 508).

The failure to charge assault in the second degree as a

lesser included offense, in addition to the other errors committed at this trial, requires a reversal of defendants' convictions. Accordingly, I would order a new trial.